## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

GAIL CHISUM                                        CIVIL ACTION

VERSUS

MERCEDES-BENZ USA, LLC, ET AL.               NO. 18-00661-BAJ-EWD

## RULING AND ORDER

Before the Court are three motions. The first is **Plaintiff's Motion for Summary Judgment (Doc. 55)**, filed by Gail Chisum. This Motion is opposed by Mercedes-Benz USA ("MBUSA") and Winnebago Industries, Inc. ("Winnebago") (collectively "Defendants"). (Doc 59). The second is the unopposed **Motion for Summary Judgment (Doc. 57)** filed by Winnebago. The third is **Defendant's Motion for Summary Judgment (Doc. 65)**, filed by MBUSA. This Motion is opposed. (Doc. 71). For the reasons offered, Plaintiff's Motion is **DENIED**. Winnebago's Motion is **GRANTED**. MBUSA's Motion is **DENIED**.

### I.    FACTS

Plaintiff purchased a new, 2014 Winnebago View, Model WM524M motor home (the "Vehicle") from Miller's RV Center in Baton Rouge, Louisiana on April 30, 2015. (Doc. 22, p. 3). The Vehicle was constructed on a Mercedes-Benz Sprinter chassis[1], which was sold by MBUSA to Loeber Motors, Inc., a MBUSA authorized dealer. (Doc. 57-1, p. 4). Loeber Motors, Inc. then sold the Sprinter chassis to Winnebago.

---

[1] VIN #WDAPF4CC4D9557489

1

(*Id.*). Winnebago, which manufactured the Vehicle's recreational quarters[2] (Doc. 55, p. 10), sold the completely assembled Vehicle to Miller's RV Center. (*Id.*).

At the time of sale, the Vehicle was covered by two relevant warranties. The first was MBUSA's Warranty, which covered "the chassis and drivetrain components, including the NOX sensors and wheel speed sensors." (Doc. 57-1, p. 5). The second was the Winnebago New Vehicle Limited Warranty ("NVLW"), which covered the parts of the Vehicle manufactured by Winnebago for the earlier of 12 months or 15,000 miles. (Doc. 57-1, p. 5) (citing Doc. 57-12, p. 1). Relevantly, the NVLW excluded from its coverage "part[s] or component[s] covered under a warranty issued by its manufacturer (for example, the chassis, drivetrain, wheels, tires, electronics, and appliances) . . . ." (*Id.*).

Between the date of purchase, April 30, 2015, and when the Plaintiff ceased using the Vehicle for travel in June 2018, the Vehicle was serviced six times. (Doc. 55-2, p. 47–8). Between April and July 2015, Plaintiff accumulated over 3,000 miles of use without issue. (Doc. 57-10, p. 37). On July 30, 2015, Plaintiff brought the Vehicle to Mercedes-Benz of Baton Rouge ("MBBR") for a routine oil and filter change, and to determine the cause of a "check engine" light. (Doc. 55-4, p. 23). MBBR determined that the NOx sensors[3] were faulty and replaced them, resolving the issue for a short time. (Doc. 65-3).

Between the July 2015 servicing and the next service visit in June 2016,

---

[2] Serial number 10544R280385
[3] The Vehicle is outfitted with two nitrogen oxide "NOx" sensors—one "upstream" and one "downstream." (Doc. 59, p. 2). Together, these are used to reduce nitrogen oxide gasses, "as well as monitor the efficiency of the SCR [catalytic converter] system." (Doc. 59-3, p. 2).

Plaintiff experienced no issues with the Vehicle that were attributable to components manufactured by MBUSA or Winnebago. (Doc. 57-10, p. 43). Plaintiff brought the Vehicle in to MBBR for a routine oil change in June 2016, having added nearly 17,000 miles to the odometer. (Doc. 57-10, p. 43); (Doc. 55-2, p. 48).

In August 2016, while on the way to Smoky Mountain National Park in Gatlinburg, Tennessee, the Vehicle's check engine light, Antilock Brake System ("ABS") light, and traction control lights illuminated. (Doc. 55, p. 12). The cruise control also became inoperative—although the Vehicle was able to maintain roadway speed. (*Id.*). When Plaintiff brought the Vehicle to Mercedes-Benz of Birmingham to determine the cause, it found that the rear RPM sensor[4] was faulty. The sensor was replaced, and the issue was resolved for a time. (Doc. 65-7, p. 1).

Plaintiff drove the Vehicle for over 11,000 more miles before it was required to be serviced again in May 2017. (Doc. 55-2, p. 47). While this service visit was primarily for routine periodic maintenance, Plaintiff also lodged a formal complaint for the first and only time, stating that the Vehicle would lose power when completing 90-degree left turns. (Doc. 71, p. 15). Plaintiff describes the issue as a five-second pause, where the driver would engage the accelerator but receive no response. (Doc. 55-10, p. 50). After five-seconds, even if the turn was not completed, power would return. (*Id.* at p. 51). Plaintiff cannot recall when this problem began, but—even though neither he nor his wife complained of it again—he alleges that this problem

---

[4] The Vehicle is equipped with four RPM sensors, one at each wheel, "which measure the revolutions per minute of the wheel." (Doc. 59-3, p. 2). Faulty RPM sensors alone do not render the vehicle inoperable, nor does a loss of cruise control, which is a convenience feature. (Doc. 59-3, p. 3).

3

persisted "generally all the time on a left turn." (Doc. 57-10, p. 52).

The Vehicle was taken in to MBBR for routine periodic maintenance on August 10, 2017 at 33,310 miles. (Doc. 57-10, p. 55). A few days later, while on a trip, the indicator lights on the Vehicle illuminated again, rendering the cruise control inoperable. (Doc. 71, p. 2). The Plaintiff took the Vehicle to Mercedes-Benz of Northwest Arkansas to be serviced, where the Vehicle was kept overnight. (*Id.*). The RPM sensor was replaced, and the Vehicle continued on the road with no issues for approximately 5,000 more miles.

The Vehicle was serviced again in May 2018. (Doc. 65-8). Plaintiff alleges that he lost power on the interstate near Natchitoches, Louisiana while he and his wife were on their way to Santa Fe. (Doc. 57-10, p. 62). He alleges that the Vehicle simply "died on" him. (Doc. 55-7, p. 32). He was able to pull it to the side of the highway, where the Vehicle restarted. (*Id.*). Plaintiff attempted to call a Mercedes-Benz dealer in Shreveport, but it was unable to service the Vehicle for at least a week. (Doc. 57-10, p. 63); (Doc. 55-7, p. 32). Undeterred, Plaintiff and his wife continued their trip, attempting to contact dealers in Bossier City, Dallas, Amarillo, and Santa Fe, before finally getting the Vehicle serviced in Albuquerque, some 900 miles away from where the incident initially occurred. (Doc. 57-10, p. 63). Although the cruise control was inoperable, Plaintiff did not have any other problems on the trip. (Doc. 55-7, p. 36).

On June 14, 2018, the same lights illuminated, and the Vehicle's cruise control again became inoperative. (Doc. 55, p. 15). Rather than tender the Vehicle for repair again, Plaintiff requested that MBUSA repurchase the Vehicle. (*Id.*). When MBUSA

4

refused, Plaintiff ceased using the Vehicle for travel and stored it in a shed on his property. (Doc. 55, p. 15)

Two weeks later, Plaintiff filed suit against Defendants to recover damages under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"), and Louisiana's redhibition law, alleging that the continued illumination of the check engine and other lights breached the express and implied warranties on the Vehicle. (Doc. 22). Winnebago and MBUSA assert that Plaintiff has not demonstrated that they breached any warranty, nor that there were redhibitory defects, and they separately move for summary judgment. (Docs. 57, 65).

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting that a fact cannot be genuinely disputed must support the assertion by citing materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers" or that an adverse party cannot produce admissible evidence to support the presence of a genuine dispute. *See* FED. R. CIV. P. 56(c)(1).

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (quotation marks and footnote omitted). "This burden is not

satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation marks and citations omitted). In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) (citation omitted).

## III.   ANALYSIS

Plaintiff brought his claims under the MMWA and Louisiana state law. (Doc. 22). These will be addressed in turn.

### A. MMWA Violation

"The MMWA establishes standards governing the content of consumer product warranties and creates a legal remedy for consumers who are harmed by a warrantor's failure to comply with the obligations established in a warranty." *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 472 n.3 (5th Cir. 2002). While the MMWA does not require that a seller provide a warranty on a product, if a warranty is given "it must comply with the terms of the Act." *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1061 (5th Cir. 1984). The MMWA established private right of action for any "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the statute], or under a written warranty, implied warranty, or service contract." 15 U.S.C.A § 2310(d)(1).

The MMWA defines "written warranty" as:

(A) any written affirmation of fact or written promise made in

6

connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C.A. § 2301(6).

The MMWA also permits warrantors to limit their warranties, either with regard to duration or coverage, so long as they "fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty." 15 U.S.C.A. § 2302(a). *See also* 15 U.S.C.A. § 2308(b). The warranties provided by MBUSA and Winnebago were both "limited" warranties. (Doc. 59, p. 8); (Doc. 57-1, p. 4).

It is undisputed that Winnebago's NVLW complied with the MMWA. The NVLW states in bold heading that is a "limited" warranty, and outlines in plain, clear language what is and is not covered under the warranty. *See* (Doc. 57-12). The NVLW specifically provides that "Basic Coverage ends after 12 months or when the vehicle's odometer registers 15,000 miles (24,135 kilometers), whichever is sooner." (Doc. 57-12, p. 1). In this case, Plaintiff's Basic Coverage under the warranty ceased on April 30, 2016—one year after the purchase date.

Similarly, it is undisputed that MBUSA's Warranty complied with the MMWA.

The booklet has a table entitled "**WARRANTY COVERAGE AT A GLANCE**" that explicitly outlines the duration of the "New Vehicle Limited Warranty Coverage." (Doc. 55-2, p. 22). Directly next to the table of contents under a heading labeled "***IMPORTANT,***" the Warranty states "[t]his booklet contains the warrantor's limited warranties." (Doc. 55-2, p. 23). The actual description of the limited warranty, much like the NVLW, outlines who is covered by the warranty, what is covered by the warranty, what items are covered by other warranties, when the warranty begins, when it ends, and any other requirements the Vehicle owner must know to avail themselves of the warranty in clear, easy to understand language. (Doc. 55-2, p. 23–25).

Therefore, because Plaintiff has not provided evidence that MBUSA or Winnebago violated the MMWA, this claim is dismissed.

### B. Express Warranty Claim—Winnebago[5]

It is uncontested that all alleged "actionable conduct" involved problems with the chassis or drivetrain parts, which were not "warranted or tendered for repair to Winnebago." (Doc. 57-1, p. 6); *See also* (Doc. 57-12, p. 1) ("**Excluded from Basic Coverage:** . . .the chassis, drive train, wheels, tires; electronics and appliances."). Because Plaintiff has not presented evidence that Winnebago failed to remedy defects covered by the warranty, Plaintiff's claims against Winnebago for breach of express

---

[5] Because MBUSA's Warranty explicitly provides that it only "covers the cost of [] parts and labor needed to repair any item on your Sprinter when it left the manufacturing plant that is defective in material, workmanship, or factory preparation," (Doc. 55-2, p. 24), Plaintiff's express warranty claims against MBUSA are discussed, *infra*, alongside the implied warranty claims.

warranty under the MMWA are dismissed.

### C. Redhibition and Implied Warranty Claims

"Federal courts apply analogous state law to breach of warranty claims under the MMWA." *Naquin v. Forest River, Inc.*, No. 1:17-CV-01311, 2018 WL 3147497, at *9 (W.D. La. May 16, 2018), *report and recommendation adopted*, No. 1:17-CV-01311, 2018 WL 3131058 (W.D. La. June 26, 2018) (citations omitted). Therefore, the analysis of Plaintiff's MMWA claim for beach of implied warranty and Plaintiff's redhibition claim will be identical.

Under Louisiana law, sellers are bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product's intended use, so long as those defects existed at the time of delivery. La. Civ. Code arts. 2475, 2520, 2530. A buyer has an independent right of recovery against a manufacturer who sold a defective product to a seller. *Aucoin v. Southern Quality Homes, LLC*, 2007-1014, p. 11 (La. 2/6/08); 983 So. 2d 685, 694. Manufacturers are presumed to know of defects in their products. *Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 899 (5th Cir. 2010) (citation omitted).

To establish a redhibitory defect, Plaintiff must prove:

(1) the thing sold is absolutely useless for its intended purposes or that its use is so inconvenient that it must be supposed that he would not have bought it had he known of the defect;

(2) that the defect existed at the time he purchased the thing, but was neither known or apparent to him;

(3) that the seller was given the opportunity to repair the defect.

*Allston v. Fleetwood Motor Homes of Indiana Inc.*, 480 F.3d 695, 699 (5th Cir. 2007)

(citations omitted).

The buyer has the burden of proving the existence of the defect by a preponderance of the evidence. *Morris v. United Servs. Auto Ass'n.*, 32,528, p. 14 (La. App. 2 Cir. 2/18/00); 756 So. 2d 549, 561. "The buyer need not prove the underlying cause of the defect, but only that it existed. In other words . . . the buyer can show that the product was defective without being required to prove the exact or underlying cause for its malfunction." *Id.* (citations omitted).

### i.  Winnebago

The alleged redhibitory defects here are all components of the chassis and drivetrain, which were manufactured and warranted by MBUSA. (Doc. 57-1, p. 10). Plaintiff has not alleged any defect in any part of the Vehicle warranted or manufactured by Winnebago. Therefore, Winnebago cannot be held liable for any redhibitory defects. Winnebago's Motion (Doc. 57) is granted on these grounds.

### ii.  MBUSA

It is undisputed that MBUSA was given the opportunity to repair the defects. However, MBUSA asserts that Plaintiff has not demonstrated that the Vehicle was rendered absolutely useless for its intended purpose, and therefore that summary judgment should be granted to MBUSA on these grounds. (Doc. 65-1, p. 8). Plaintiff asserts that the Vehicle was rendered useless. (Doc. 55, p. 17). In the alternative, even if the Court finds that the Vehicle was not rendered absolutely useless for its intended purpose, Plaintiff contends that the constant repairs, lack of features, and the threat of losing power made the use of the Vehicle so inconvenient as to support a claim for redhibition. (Doc. 71, p. 8). Inconvenience is judged by the reasonable

person standard. *Justiss Oil Co, Inc. v. Oil Country Tubular Corp.*, 2015-1148, p. 23 (La. App. 3 Cir. 4/5/17); 216 So. 3d 346, 361.

### a.  Redhibitory Nature of Defects

While a plaintiff "need not prove that the alleged defect is difficult to repair" to prevail in an action for redhibition, *Prince v. Paretti Pontiac Co., Inc.*, 281 So. 2d 112, 116 (La. 1973), minor defects alone do not constitute redhibitory defects. *Ford Motor Credit v. Laing*, 30,160, p. 4 (La. App. 2 Cir. 1/21/98); 705 So. 2d 1283, 1286. However, multiple defects—whether minor, or repairable—may collectively support redhibition. *Fidele v. Crescent Ford Truck Sales, Inc.*, 00-1934, p. 9 (La. App. 5 Cir. 4/11/01); 786 So. 2d 147, 153.

In summary, Plaintiff has complained of two categories of defects. First, there are the sensor defects, which have allegedly occurred on a yearly basis since the Vehicle was purchased. When the sensors fail, apparently triggering the check engine light to illuminate, the cruise control becomes inoperable. However, these defects do not render the Vehicle "absolutely useless." This is evidenced by the fact that Plaintiff drove the Vehicle from Louisiana to New Mexico with the indicator lights on and without cruise control. Second, the power defects, such as the alleged loss of power when turning to the left and the loss of power on the highway in May 2018, are at issue. These defects also do not render the Vehicle absolutely useless because the Vehicle was capable of turning throughout the time Plaintiff drove it. The loss of power on the highway, while concerning, has not been duplicated and never occurred again.

11

Nevertheless, in their totality, there is a genuine issue of material fact as to whether the defects render the Vehicle's use so *inconvenient* that a reasonable person would not have purchased the Vehicle had he known about the defects. The purchase price of the Vehicle was $102,000.00, and Plaintiff was willing to pay that amount because he believed he was purchasing a reliable, easy-to-drive vehicle. (Doc. 55, p. 17). However, due to the problems with the Vehicle, Plaintiff began to feel uncomfortable driving it in places that did not have cell phone service, in anticipation that something may go wrong. (Doc. 55, p. 20). Plaintiff had issues during some road trips due to the check engine light illuminating. (Doc. 71, p. 2–4). He stopped driving it in June 2018 when the check engine light illuminated again, and Plaintiff again lost all use of the cruise control system. (*Id.*). The issue occurred at least once more. In May 2019 the problems recurred when Plaintiff drove it to be inspected by Defendant. (Doc. 71, p. 5). Plaintiff asserts that a reasonable person could find that the inability to rely on the Vehicle for its normal and intended use was inconvenient, such that had they known about these issues they would not have purchased it.

However, MBUSA argues that the defects were minor, as the Vehicle was only out of commission for "a total of 17 days over 3 years and 39,000 miles." (Doc. 65-1, p. 2). Plaintiff clearly was able to take many trips without incident, given the mileage of the Vehicle. Further, at no point was the Vehicle rendered completely inoperable. This evidence supports MBUSA's claim that the defects were not redhibitory. Given this dispute, summary judgment cannot be granted in favor of either MBUSA or Plaintiff on this issue.

### b. When Defects Arose

Because Plaintiff did not experience any problems with the Vehicle in the first three days of ownership, he does not benefit from a presumption that the defect existed at the time of delivery. *See* LA. CIV. CODE art 2530 ("The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time."). However, the Fifth Circuit, in *Sweeny v. Vindale Corp.*, noted that Louisiana courts have held that "even if the defect appears more than three days after the sale, a reasonable inference may arise, in the absence of an intervening cause or other explanation, that the defect existed at the time of sale." S*weeny v. Vindale Corp.*, 574 F.2d 1296, 1300 (5th Cir. 1978) (citations omitted).

Plaintiff asserts that defective manufacturing is the only explanation for the defects. (Doc. 55, p. 17). During the six service dates, no dealer noted that the Vehicle was misused or ill-maintained. (*Id.*). MBUSA's warranty only covers "the cost of all parts and labor needed to repair any item on your Sprinter vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." (Doc. 55-2, p. 24). All repairs and replacements were covered under MBUSA's warranty, during the warranty period. (Doc. 71, p. 6). This leads to an inference that the defects were in the manufacturing process of the Vehicle. *See Bendana v. Mossy Motors, Inc.*, 347 So. 2d 946 (La. App. 4 Cir. 1977); *Moreno's Inc v. Lake Charles Catholic High School, Inc.*, 315 So. 2d 660, 663 (La. 1975) ("When a compressor designed to work satisfactorily for ten years fails in 2 ½ years, an inference may logically be drawn under these circumstances that a fault exists in its manufacture.").

However, MBUSA contends that improper maintenance could have caused the "defects" Plaintiff alleges. (Doc. 65-1, p. 5). MBUSA points out that there is evidence that there was a rodent infestation in the Vehicle in May 2019. (*Id.*). Plaintiff's wife also testified that there was an Asian ladybeetle infestation in the Vehicle, which was discovered once she and Plaintiff ceased using it. (Doc. 59-12, p. 43). These could, arguably, affect the drivability of the Vehicle. (Doc. 59-3, p. 5). The fact that Plaintiff garaged his Vehicle in the same shed where it currently sits and was subjected to pests creates an issue of fact as to whether pest damage could have caused some of the previous issues underlying Plaintiff's complaint.

On the other hand, any damage attributable to these pest infestations was only documented after Plaintiff stopped using the Vehicle for travel. (Doc. 71, p. 5). Defendants have not presented any evidence of improper maintenance prior to Plaintiff's decision to cease using the Vehicle. In addition, when the Vehicle was test driven as a part of this lawsuit in May 2019, the Vehicle worked properly. (Doc. 65-4, p. 5). This weighs against the argument that pest damage could possibly cause the alleged defects Plaintiff complained of. However, it also calls into question what, if any, defect exists in the Vehicle.

Therefore, because an issue of fact is presented as to whether a defect existed at the time of sale, summary judgment is inappropriate on this issue.

### c.  Rescission as a Remedy

MBUSA argues that there are no redhibitory defects, and therefore that rescission is inappropriate. (Doc. 65-1, p. 14). As evidence of this, MBUSA points out that Plaintiff used the Vehicle for over three years while the complained of defects

were in effect. (*Id.*). Plaintiff contends that the continued use of the Vehicle does not impact his right to rescission and that the defects are of a magnitude to support recission. (Doc. 71, p. 10). Plaintiff continued to use the Vehicle for as long as he believed the defects could be remedied and, when he learned that the defects could not be remedied to his satisfaction, he stopped driving it. (*Id.*).

Rescission is warranted "where new vehicles present such defects as would render their use inconvenient and imperfect to the extent that the buyer would not have purchased the automobile had he or she known of the defects." *Jones v. Winnebago Industries, Inc.*, 47,137, p. 7 (La. App. 2 Cir. 5/16/12); 92 So. 3d 1113, 1119 (citation omitted). Often, however, "a defect in the thing, although redhibitory, does not render the thing absolutely useless." *Alexander v. Burroughs Corp.*, 359 So. 2d 607, 611 (La. 1978). If the defects "merely diminish the value" of the thing sold, "the trial court has the discretion to order a reduction of the price instead of a rescission of the sale." *Berney v. Rountree Olds-Cadillac Co., Inc.*, 33,388, p. 9 (La. App. 2 Cir. 6/21/00); 763 So. 2d 799, 805. In addition, a buyer's continued use of a vehicle does not automatically bar rescission as a remedy, particularly where the buyer is assured by the seller that defects would be corrected. *See Dunlap v. Chrysler Motors Corp.*, 299 So. 2d 495, 497 (La. Ct. App. 4 Cir. 1974) ("The Supreme Court of Louisiana recognized . . . the principle that extensive use of an automobile under certain fact situations would not bar a vendee from successfully bringing a redhibitory action under Civil Code Article 2520.")

For example, in *Dunlap*, the court found recission an appropriate remedy

where the plaintiff had driven the vehicle approximately 96,000 miles prior to the date of trial, but only after he "was lulled into using the car, believing defendants would correct the defects in the automobile." *Id.* However, rescission was found not to be an appropriate remedy in *Coffey v. Cournoyer Oldsmobile-Cadillac-GMC, Inc.*, 484 So. 2d 798 (La. Ct. App. 1 Cir. 1986). The vehicle in *Coffey* suffered from redhibitory defects, including a failure to start on at least four different occasions. *Id.* at 801. Because, however, plaintiff had driven the vehicle 32,000 miles by the time of trial, a reduction in price rather than rescission was warranted. *Id.*; *See also Nelkin v. Piotrowski*, 448 So. 2d 495 (La. Ct. App. 5 Cir. 1984) (finding rescission inappropriate where buyer had used car for three years after sale and had driven an additional 25,000 miles).

An issue of fact is presented here as to whether the allegedly redhibitory defects are so inconvenient as to warrant rescission. Even the most serious defect Plaintiff alleges—losing power on the highway—was not so serious as to derail Plaintiff's trip but was unnerving enough that Plaintiff stopped driving the Vehicle soon thereafter. (Doc. 71, p. 3). The most frequent defect, the loss of cruise control, did not render the Vehicle "absolutely useless," as discussed *supra*. Therefore, because a genuine issue of fact is presented as to whether the defects rendered the use of the Vehicle so inconvenient that it must be presumed that Plaintiff would not have purchased it if he had known about the defects, or whether the defects merely diminished the utility of the Vehicle, summary judgment is inappropriate on this issue.

IV.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 55) is **DENIED.**

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Winnebago Industries, Inc. (Doc. 57) is **GRANTED.** Plaintiff's claims against Winnebago are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Mercedes-Benz USA, LLC (Doc. 65) is **DENIED**.

Baton Rouge, Louisiana, this 31st day of March, 2021

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**